# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SHERRON DESHAWN DAVIS,

        Defendant-Appellant.

UNPUBLISHED
September 15, 2016

No. 326932
Wayne Circuit Court
LC No. 15-000361-FC

Before: GADOLA, P.J., and WILDER and METER, JJ.

PER CURIAM.

Defendant was convicted after a jury trial of armed robbery, MCL 750.529, conspiracy to commit armed robbery, MCL 750.157a; MCL 750.529, assault with intent to do great bodily harm less than murder, MCL 750.84, conspiracy to commit assault with intent to do great bodily harm less than murder, MCL 750.157a; MCL 750.84, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.  The trial court sentenced defendant to concurrent terms of 20 to 40 years' imprisonment for the armed robbery and conspiracy to commit armed robbery convictions, 5 to 10 years' imprisonment for the assault with intent to do great bodily harm less than murder and conspiracy to commit assault with intent to do great bodily harm less than murder convictions, and a consecutive sentence of two years' imprisonment for the felony-firearm conviction.  Defendant appeals as of right, and we affirm.

Defendant's convictions arise from the assault and armed robbery of Dwain Hayes on October 8, 2014, near the intersection of State Fair Avenue and Strasburg Street in the city of Detroit.  On that evening, Hayes was visiting the home of his uncle on Strasburg Street.  Defendant was present at the home, as was Glen Thomas.  Hayes, defendant, and Thomas are all related through the marriage of other relatives.  Hayes testified that he had known defendant and Thomas since the two were little children, being about twenty years.  Hayes testified that about two months earlier, he had told defendant and Thomas that he had started a job in which he was bringing home a thousand dollars a week; Hayes had encouraged defendant and Thomas to apply for work at the same place because the employer was hiring.

As Hayes was preparing to leave his uncle's home on the evening of October 8, 2014, defendant and Thomas asked Hayes if he would give them a ride in his car to a destination a few blocks away.  Hayes agreed.  Defendant sat in the front passenger seat of Hayes' car, while Thomas sat in the back seat of the car behind Hayes.  Hayes testified at trial that shortly after

-1-

defendant and Thomas got into the car, he noticed that Thomas was putting on gloves. A few moments later, Hayes heard a gunshot from the back seat and realized that he had been shot in the back of his head. After hearing the gunshot, Hayes heard Thomas tell defendant to check Hayes' pockets. Defendant immediately grabbed Hayes and began patting the right side of Hayes' pants' pockets. Hayes testified that defendant then said "It's stuck. I can't get it. It's stuck. It's stuck."

The car, still being driven by Hayes, crashed into a fence and came to rest against a fire hydrant. Jovan Houston, a nearby pedestrian, testified that he and his girlfriend were on Strasburg Street that evening and saw Hayes' car crash. Houston testified that after the car came to a stop, he saw two African American males dressed in dark clothing emerge from the car, one from the front passenger seat and one from the back seat on the driver's side. The two males ran in different directions, then one returned briefly and appeared to look for something before running away again. The driver's door was open and Houston saw Hayes lying on the ground near the car in a puddle of blood. Houston and his girlfriend called the police and attempted to assist Hayes. Hayes, who was conscious, mentioned a name that sounded like "Ron" and told Houston "them was my dogs. They was trying to rob me."

Angela Thomas, the aunt of defendant and Glen Thomas, testified that she lived in the neighborhood where the crimes occurred and that defendant was living in her home at that time. She heard the sirens near her home that evening and, shortly thereafter, defendant and Glen Thomas arrived at her house. According to Angela Thomas, defendant arrived wearing black pants and shirt but changed his clothes at her house and asked for clothing for Glen Thomas. She testified that defendant was not acting in his typical manner and left the house quickly after changing clothing. According to Angela Thomas, during a phone call sometime after the shooting, defendant admitted to her that Glen Thomas had shot Hayes.

Defendant was arrested on December 12, 2014, and arraigned on the charges on January 21, 2015. Defendant attended a pretrial conference before the trial court on February 23, 2015[1]. Defendant's attorney was not present and defendant was represented for purposes of that hearing by the attorney representing Glen Thomas. In response to the trial court setting the trial date for one week in the future, defendant and the trial court had the following exchange, in relevant part:

DEFENDANT DAVIS:      See, about the trial date, I don't have my discovery package, no transcript, nothing. I don't remember my lawyer. I only met with my lawyer two times. So we have not been able to come up with no defense or none of that.

THE COURT      Well, I will have Mr. Slameka come here. If you don't have any objection, I'll tell him to get over to see his client.

---

[1] Defendant also attended a very brief pretrial conference earlier on January 28, 2015, but only docketing issues were discussed and defendant did not address the trial court.

DEFENDANT DAVIS:      This is my second day I seen him.  I have been on all . . .

THE COURT:      All right.  I'm going to direct that he see the defendant, to see Mr. Davis today.

Another pretrial conference was held two days later on February 25, 2015, at which time defendant rejected a plea agreement and chose to proceed to trial.  One week later, the parties proceeded to trial on the charges against defendant.  Before the jury voir dire began, the court and defense counsel discussed whether the defense would be calling Glen Thomas as a witness.  It was determined that Glen Thomas' attorney had advised him not to testify.  Defendant, defense counsel, and the trial court then had the following exchange:

THE COURT:      All right.  Mr. Davis, you had your hand up, sir.  What would you like to say?

DEFENDANT DAVIS:      Me and my lawyer, we ain't getting along.  He -- ain't no communication.  He just came back there and told me he ain't fixing to fight for me.

MR. SLAMEKA:      His lawyer didn't say that.  His lawyer went back there and - -

DEFENDANT DAVIS      My lawyer told me he's not fixing to fight for me.  I asked him to come out here and tell you that he was going to step off my case.  He told me something like he wants to step on my face.  The last week Friday he told me he ain't my Momma and all this crazy stuff.

MR. SLAMEKA:      I went back there and explained to Mr. Davis that Mr. Thomas is not going to testify.

DEFENDANT DAVIS:      That is not – man, say what you said.

MR. SLAMEKA:      Is there any chance that I can complete myself?

DEFENDANT DAVIS:      Yes, you just –

THE COURT:      Go ahead, Mr. Slameka.

MR. SLAMEKA:      Thank you, Judge.  I said Mr. Thomas is not going to testify.  In my humble opinion based upon the facts of this case and the thorough investigation I've done speaking with Ms. Towns [the prosecutor] at least a dozen times, I suggested to him that the offer, which is way below the guidelines ought to be suggested.

DEFENDANT DAVIS:      He only came to see me one time.

-3-

THE COURT:     Mr. Davis, I want to hear from Mr. Slameka.  Then I'll hear from you, sir.  I'm going to hear from one person at a time.  Mr. Slameka, do you want to finish your thought please?

MR. SLAMEKA:     Thank you, sir.  And I suggested to him that he ought to consider the 10 years.  He told me no, get off my case because I ain't doing nothing for him.  I've been to the jail twice.  I provided him with a transcript, which is the complete testimony of the only res gestae witness.  I've see[n] him six different times in various bullpens because we Pretrialed this case I don't know how many times.

DEFENDANT DAVIS:     No, you didn't.

MR. SLAMEKA:     This is what I continuously get.  He's totally disruptive.  He doesn't listen to me.  He doesn't care about anything whatsoever.  I'm ready to try this case, Judge, because it's a very simple case as you know.  You just heard a plea from the other gentleman [Glen Thomas] as to what transpired.  My client is aware of that.  I discussed this matter with my client.  At first he denied ever being involved.  Then he gave me a different version of what's going on.  I understand it, and I think after 46 years I'm capable of representing him.  If he doesn't want me, that's his business.  Thank you, Judge.

THE COURT:     All right.  Mr. Davis what do you want to say?

DEFENDANT DAVIS:     We only talked about what happened one time.  I never gave this man no two different stories about nothing.  Then it's never no communication.  Every time we talk, he got an attitude, and he just told me he not fixing to fight for me.  Talking about he ain't my Momma, [h]e wish he could step on my face, something crazy what he just came back there and said.

MR. SLAMEKA:     There were four people in that bullpen.  If you want to bring any of them out as to whether I said that, I would stand on the record.  Secondly, I never said I wouldn't fight for him.  He said you're not fighting for me.  Thank you, Judge.

DEFENDANT DAVIS:     When I said that, you said no, no, I'm not.  I'm not fighting for you.

MR. SLAMEKA:     Thank you, Judge.

THE COURT:     Well, this is the afternoon of trial.  This matter is going to go forward.  We're going to get the jury.  We're going to bring them in.  We're going to move forward.  The offer that had been made by Ms. Towns is one that was placed on the record.  It's my understanding Mr. Davis is not interested in the offer and wants to go to trial.  That certainly is his right.  And if he's choosing to go forward, that's the case, and we will in fact go forward.

DEFENDANT DAVIS:     I don't want to go forward with Mr. Slameka.

-4-

THE COURT: I understand that. I heard that, and I understood what you said. But this is 10 minutes to two the afternoon of the first day of trial, and you say you want a new lawyer. It's too late in the day, and Mr. Slameka is prepared to represent you, and we can go forward.

DEFENDANT DAVIS: I tried to tell the bailiff to like somehow can I talk to you and let you know about this matter.

THE COURT: What matter are you talking about? I mean –

DEFENDANT DAVIS: I'm talking about –

THE COURT: It's clear to me that you say you don't want Mr. Slameka to represent you today. I understand that. I heard that. But we're going forward with the trial today. All of the witnesses have been notified. The jurors have been notified. Today is the time to go forward. There could have been an earlier time to bring that to my attention. It hasn't happened. We're going forward. It's a delay tactic. I'm not going to have that.

The trial court then proceeded with the voir dire of the jury with defense counsel representing defendant. The trial began the following day, resumed the following Monday, and concluded with the jury convicting defendant. On appeal, defendant argues that the trial court abused its discretion by denying his request for substitution of counsel. We disagree.

This Court reviews a trial court's decision regarding a defendant's request for substitution of appointed counsel for an abuse of discretion. *People v Traylor*, 245 Mich App 460, 462; 628 NW2d 120 (2001). A trial court's decision is considered an abuse of discretion if it falls outside the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

The federal and state constitutions grant the right to counsel in all criminal prosecutions. US Const, Am VI; Const 1963, art 1, § 20; *People v Marsack*, 231 Mich App 364, 372; 586 NW2d 234 (1998). But while an indigent defendant is guaranteed the right to counsel, a defendant is not necessarily guaranteed the attorney of his or her choice, *Traylor*, 245 Mich App at 462, and is not entitled to substitution of appointed counsel merely because the defendant is dissatisfied with appointed counsel. *People v Bradley*, 54 Mich App 89, 95; 220 NW2d 305 (1974). A defendant is entitled to substitution of defense counsel, however, if discharge of the first attorney is for (1) good cause and (2) does not unreasonably disrupt the judicial process. *People v Buie (On Remand)*, 298 Mich App 50, 67; 825 NW2d 361 (2012).

Good cause is not established if a defendant merely lacks confidence in counsel or is generally unhappy with counsel. *People v McFall*, 309 Mich App 377, 383; 873 NW2d 112 (2015); *People v Strickland*, 293 Mich App 393, 398; 810 NW2d 660 (2011). Rather, good cause may exist when (1) the defendant and appointed counsel develop a legitimate difference of opinion regarding a fundamental trial tactic, (2) there has been a breakdown in communication and in the attorney-client relationship, or when (3) defense counsel has shown a lack of diligence or interest. *McFall*, 309 Mich App at 383. A difference of opinion is considered legitimate when the difference is based on a disagreement as to a fundamental trial tactic, but not when the

difference of opinion is only about trial strategy or professional judgement. *Strickland*, 293 Mich App at 398. For example, this Court has held that a defense attorney's decision to call a witness is considered a matter of trial strategy. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

In this case, defendant contends that there had been a breakdown in the attorney-client relationship sufficient to establish good cause. On the first day of trial prior to beginning the jury voir dire, defendant and defense counsel had a strenuous disagreement in the courtroom. The argument was triggered when defense counsel determined that Glen Thomas would not be testifying upon the advice of his counsel. Upon hearing the news, defendant accused counsel of "not fixing to fight" for him, and asked the trial court to appoint substitute counsel. Because the decision to call a witness is a matter of trial strategy and not a fundamental trial tactic, that allegation by itself is not adequate to establish good cause for the substitution of counsel. Here, however, the disagreement appears to have been deeper and more fundamental than simply a dispute over whether to call a witness.

The record from the first day of trial reflects that defendant and defense counsel had a very acrimonious relationship. Defendant and defense counsel interrupted each other, spoke over each other, and accused each other of not listening. Defense counsel stated during the hearing that "[t]his is what I continuously get. He's totally disruptive. He doesn't listen to me. He doesn't care about anything whatsoever." Defendant reported to the trial court that when he had asked defense counsel to "step off his case" defense counsel told defendant that he wanted to "step on his face." Also, defense counsel did not present his client's request for new counsel to the trial court; defendant's request was presented to the trial court only because defendant shouted over his own attorney.

A review of the record also indicates that defense counsel apparently became angry because defendant declined the offered plea bargain. Defense counsel stated before the trial court: "In my humble opinion based upon the facts of this case and the thorough investigation I've done speaking with Ms. Towns [the prosecutor] at least a dozen times, I suggested to him that the offer, which is way below the guidelines ought to be suggested" and "I suggested to him that he ought to consider the 10 years. He told me no, get off my case because I ain't doing nothing for him." More troubling is that defense counsel told the trial court "I'm ready to try this case, Judge, because it's a very simple case as you know. You just heard a plea from the other gentleman [codefendant Glen Thomas] as to what transpired. My client is aware of that. I discussed this matter with my client. At first he denied ever being involved. Then he gave me a different version of what's going on." Defense counsel thereby appears to have revealed to the trial court a privileged communication from his client stating that defendant had told conflicting stories and implying that defendant perhaps had conceded involvement in the crimes.

When a defendant asserts that assigned counsel should be replaced, the trial court is obligated to inquire into whether the allegations are true. *People v Bass*, 88 Mich App 793, 802; 279 NW2d 551 (1972). The trial court is required to hear the allegation and, if necessary, take testimony and state its findings and conclusion. *People v Ginther*, 390 Mich 436, 442; 212 NW2d 922 (1973). Here, the trial court did not determine whether defendant's allegation of a breakdown in the attorney-client relationship was true and instead considered only whether substitution of counsel would delay the judicial process. Defense counsel's behavior during the

exchange before the trial court, however, strongly indicated a breakdown in the attorney-client relationship, and thus the trial court should have inquired further regarding the validity of defendant's allegation.

But even when good cause is demonstrated, substitution of counsel is only warranted where it will not unreasonably disrupt the judicial process. Where the jury, witnesses, prosecutor, and defense counsel were ready to proceed, this Court has held that a defendant's request on the first day of trial for substitution of counsel would have unreasonably delayed the judicial process. See *Strickland*, 293 Mich App at 399. In this case, defendant requested substitution of counsel on the first day of trial shortly before the voir dire of the jury. The trial court noted that substituting counsel at that time would disrupt the judicial process. No doubt this is accurate, given that the trial court, the attorneys, and the prospective jurors were ready to proceed. But it is difficult to envision a scenario in which substitution of counsel does not delay judicial proceedings, at least somewhat.

Here, the trial court chastised defendant for failing to request substitution of counsel earlier and concluded that defendant was intentionally seeking to delay the proceedings. A review of the record does not support this assessment. Defendant was arrested on December 12, 2014 and was arraigned on January 21, 2015. At the pretrial conference held February 23, 2015, defendant learned that his trial was going to be set for just one week in the future. Defendant's attorney was not present. Defendant expressed his concern to the trial court that he had not yet received any written material from his attorney nor met with his attorney for any meaningful discussion about the upcoming trial. The trial court assured defendant that defense counsel would be directed to meet with defendant. One week later, on the date scheduled for trial to begin, defendant requested substitution of counsel.

There is no indication that defendant delayed in this request. Rather, defendant appears to have made his request at the first opportunity he had to address the trial court after having had an opportunity to meet with his defense counsel to discuss trial strategy after rejecting the plea offer. In fact, the time between defendant's arraignment on the charges and the first day of trial was approximately six weeks. Approximately one week before the start of trial, defendant informed the trial court that he had not yet received any materials from defense counsel and had not yet had an opportunity for a meaningful discussion with defense counsel regarding his defense. One week later, after meeting with defense counsel, defendant requested substitution of counsel.

Further, there is no indication on the record that there previously had been any delay in the judicial process by defendant. See e.g., *People v Williams*, 386 Mich 565, 577; 194 NW2d 337 (1972). In this case, where defendant made the request for substitution of counsel at his earliest opportunity after meeting with defense counsel, had caused no previous delays, and where the entire legal process from arraignment to trial had taken place in six weeks, we question whether any delay caused by appointing substitute counsel under these circumstances could be characterized as an undue delay of the judicial process.

Nonetheless, even though defendant's allegation of a breakdown in the relationship warranted further inquiry, and even though defendant's request may not have unreasonably delayed the judicial process under the circumstances, we hold that the trial court did not abuse its

discretion in declining to appoint substitute counsel for defendant. After the trial court denied defendant's request for substitution of counsel, defense counsel proceeded to adequately represent defendant at trial. The record indicates that defense counsel was familiar with the facts of the case, diligently examined witnesses, made relevant objections, and acted diligently throughout to protect defendant's rights. There is no indication that defendant was not afforded effective assistance of counsel at trial[2].

As discussed above, a complete breakdown of the attorney-client relationship may justify appointing new counsel. *Buie*, 298 Mich App at 67. But a trial court's failure to explore a defendant's claim that his assigned counsel should be replaced does not necessarily require that a subsequent conviction be set aside. *Ginther*, 390 Mich at 442. When, as here, defense counsel thereafter performs adequately to protect defendant's interests at trial, the defendant has not been prejudiced by the trial court's denial of the request for substitution of counsel and the conviction will not be set aside. See *Buie*, 298 Mich App at 67. Accordingly, the trial court did not abuse its discretion when it denied defendant's request for substitution of counsel.

Affirmed.

/s/ Michael F. Gadola
/s/ Kurtis T. Wilder
/s/ Patrick M. Meter

---

[2] We note that the jury found defendant not guilty of assault with intent to commit murder, MCL 750.83, and not guilty of conspiracy to commit assault with intent to murder, MCL 750.157a, MCL 750.83, in accordance with defense counsel's closing argument, lending credence to the notion that defense counsel was not ineffective.